**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSE ANTONIO DUQUE-
RAMIREZ,

    Defendant - Appellant.

No. 24-6257

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:24-CR-00013-SLP-1)**
_____

Laura K. Deskin, Assistant Federal Public Defender (Jeffrey M. Byers, Federal Public Defender, with her on the briefs), Oklahoma City, Oklahoma, for Defendant-Appellant.

Steven W. Creager, Assistant United States Attorney (Robert J. Troester, United States Attorney, David R. Nichols, Jr., Assistant United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.
_____

Before **MORITZ**, **KELLY**, and **ROSSMAN**, Circuit Judges.
_____

**ROSSMAN**, Circuit Judge.
_____

The government charged Jose Antonio Duque-Ramirez with violating 18 U.S.C. § 922(g)(5)(A), which criminalizes the knowing possession of a firearm by an "alien" who is "illegally or unlawfully in the United States." Mr. Duque-Ramirez moved to dismiss the indictment under *New York State Rifle & Pistol Ass'n* v. *Bruen,* 597 U.S. 1 (2022), contending § 922(g)(5) violates the Second Amendment as applied to him. The district court denied the motion. Mr. Duque-Ramirez was convicted after pleading guilty, and he now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Like the district court, we assume without deciding Mr. Duque-Ramirez belongs to "the people" protected by the Second Amendment and reject his as-applied challenge to § 922(g)(5).

## I

### A

Mr. Duque-Ramirez was born in Mexico on February 28, 1990. *See* App. I at 199 (Joint Statement of Undisputed Facts).[1] He unlawfully entered the U.S. as a child in 1997, first living in Lubbock, Texas, before moving to Oklahoma City, Oklahoma, by 2000. Mr. Duque-Ramirez has called Oklahoma City home ever since. He attended Oklahoma City Public

---

[1] The facts in this section come from the Joint Statement of Undisputed Facts, which the parties submitted to the district to "enable the Court to rule on the merits of the as-applied motion despite no trial being held." Op. Br. at 6; *see* App. I at 199–202.

Schools from the first grade through the eleventh grade. He is the father of three children—all U.S. citizens born in Oklahoma. The mother of the youngest two, who is herself a U.S. citizen, married Mr. Duque-Ramirez in 2016. At the time of the offense conduct, Mr. Duque-Ramirez was self-employed, working as a security guard at bars in Oklahoma City.

Over the years, Mr. Duque-Ramirez has taken steps toward adjusting his immigration status. As a child, he received a Taxpayer Identification Number from the IRS and sought a provisional unlawful presence waiver (PUPW)[2] from U.S. Citizenship and Immigration Services, which was denied. In 2017, his wife filed a Form I-130 Petition for Alien Relative with the Department of Homeland Security, requesting Mr. Duque-Ramirez be granted citizenship or other lawful immigration status as the spouse of a U.S. citizen. That petition was pending during the district court proceedings.[3] In 2020, Mr. Duque-Ramirez again applied for a PUPW, but it was denied on July 18, 2024.

---

[2] A provisional unlawful presence waiver, known also as Form I-601A, permits the U.S. Attorney General to waive inadmissibility of an unlawfully present immigrant who is the child or spouse of a United States citizen or lawful resident if the applicant-immigrant can show "the refusal of admission . . . would result in extreme hardship to the citizen or lawfully resident spouse or parent" of the applicant. 8 U.S.C. § 1182(a)(9)(B)(v); 8 C.F.R. § 212.7(e).

[3] Nothing in the record reveals the status of that petition.

3

**B**

The events underlying this appeal occurred on October 17, 2023, when deputies in the Cleveland County Sheriff's Office observed Mr. Duque-Ramirez driving a white Dodge Charger with a fake tag, a spotlight, and emergency lights. An officer conducted a traffic stop and in plain sight saw a firearm, body armor with magazines, and other security-related gear. Officers then contacted Immigration and Customs Enforcement and determined Mr. Duque-Ramirez was not a U.S. citizen. A search of the vehicle revealed three loaded pistols, several tactical vests, a long-expired Oklahoma County Sheriff's Deputy badge, and a fraudulent commercial driver's license. Mr. Duque-Ramirez was arrested and taken to the Cleveland County Jail. During booking, jailers found a fraudulent green card and a fraudulent armed security license in his wallet.

A few months later, on January 17, 2024, a grand jury indicted Mr. Duque-Ramirez for violating § 922(g)(5)(A). That statute makes it unlawful for "any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to . . . possess . . . any firearm or ammunition." 18 U.S.C. § 922(g)(5)(A). Mr. Duque-Ramirez admits he is an "alien" unlawfully present in the United States. Op. Br. at 18 (acknowledging "his status as an unlawfully present noncitizen"); Oral Argument at 1:14–1:20 ("He is

4

undocumented. He is here without permission, that is true."); *see also* App. I at 15–16, 128 (acknowledging same at district court).

Mr. Duque-Ramirez moved to dismiss his indictment. He argued § 922(g)(5) was facially unconstitutional under *Bruen*, 597 U.S. 1. Applying the framework of *Bruen*, Mr. Duque-Ramirez maintained he was among "the people" covered by the plain text of the Second Amendment. App. I at 20. In support, he argued at least some unlawful immigrants have "'developed sufficient connection with this country to be considered part of' . . . the people." App. I at 19 (quoting *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). He next argued § 922(g)(5) was not "consistent with the Nation's historical tradition of firearm regulation." App. I at 20 (quoting *Bruen*, 597 U.S. at 24). Firearm possession "was not tied to citizenship when the Second Amendment was adopted," Mr. Duque-Ramirez contended, and the citizenship-based rule "is a relatively modern creation" of the twentieth century. App. I at 20–22. In his view, the government failed to carry its burden "to show that relevantly similar laws [to § 922(g)(5)] existed at the time of our founding." App. I at 22.

In opposition, the government argued, *first*, "the plain text of the Second Amendment does not cover an illegal alien's possession of a firearm." App. I at 60. And *second*, two types of analogous historical laws support the constitutionality of § 922(g)(5): (1) "laws disarming those not part of the

political community," including Indians and slaves, App. I at 68–70; and (2) laws "disarming those who presumptively have an allegiance to a foreign sovereign and have not taken an oath of allegiance," such as Catholics and "loyalists," or colonists who supported Great Britain during the American Revolution. App. I at 70–72.

In reply, Mr. Duque-Ramirez insisted the government's analogous laws were racist and xenophobic and thus had "dubious justification." App. I at 75–76. He also argued Catholics and loyalists who "actively refused" to swear a loyalty oath do not compare to unlawful aliens who "clamor for the chance to swear an oath of allegiance to the United States." App. I at 77.

The district court denied Mr. Duque-Ramirez's motion to dismiss, rejecting his facial challenge to § 922(g)(5). The district court assumed without deciding the plain text of the Second Amendment covered "aliens" like Mr. Duque-Ramirez. The court then concluded § 922(g)(5) is consistent with our Nation's tradition of firearm regulation. The court agreed with the government that founding-era loyalty or allegiance laws were "sufficiently analogous" to § 922(g)(5) and "impose[d] a comparable burden on the Second Amendment right . . . based on comparable justifications." App. I at 92.

On April 3, 2024, Mr. Duque-Ramirez pleaded guilty to the indictment without a plea agreement. A probation officer prepared the Presentence Investigation Report (PSR) a few months later. The PSR observed Mr.

Duque-Ramirez had no criminal history points and recommended an advisory Guideline range of 30 to 37 months' imprisonment.

### C

Before the sentencing hearing, however, Mr. Duque-Ramirez withdrew his guilty plea under Federal Rule of Criminal Procedure 11. He also filed another motion to dismiss the indictment—this time arguing § 922(g)(5) was unconstitutional only *as applied*. This new challenge relied on *United States* v. *Rahimi*, 602 U.S. 680 (2024), which the Supreme Court had decided shortly after Mr. Duque-Ramirez's guilty plea.

In this second motion to dismiss, Mr. Duque-Ramirez reprised many of the same arguments the court had considered and rejected in adjudicating his facial challenge to § 922(g)(5). He again maintained the plain text of the Second Amendment applied to him because he had extensive connections to the United States. Mr. Duque-Ramirez emphasized he attended public schools in Oklahoma, paid taxes, is married to a U.S. citizen, is a father to U.S. citizen children, and "had lived [in the U.S.] *for over twenty-five years* at the time of his arrest." App. I at 116–18. According to Mr. Duque-Ramirez, these ties made him a member of "the people" entitled to the Second Amendment right. He then contended history and tradition did not "allow[] for those with such close ties to the country . . . to be disarmed merely for [their] immigration status." *Id.* at 119. At minimum,

any application of § 922(g)(5) to him would first "require[] an individualized assessment" of his dangerousness because the founding generation disarmed loyalists only "after conducting an individualized assessment of the disarmed person." *Id.* at 119–20.

The government opposed the motion to dismiss—this time arguing § 922(g)(5) did not violate the Second Amendment as applied to Mr. Duque-Ramirez. Parsing the historical evidence, the government contended "one must join the body politic . . . to possess a right protected by the Second Amendment." *Id.* at 192. And the original understanding of membership in the political community, the government explained, was citizenship. Citizenship in turn requires "follow[ing] the path established by Congress, including swearing an oath of allegiance. Because Mr. Duque-Ramirez . . . instead, chose to eschew that process, Congress could constitutionally disarm him." *Id.* The government next responded to Mr. Duque-Ramirez's argument that disarmament under § 922(g)(5) first required an individual assessment of dangerousness. Even assuming the law required such an individualized assessment, the government insisted Mr. Duque-Ramirez's as-applied challenge to § 922(g)(5) would still fail. "[W]hen Mr. Duque-Ramirez was arrested, he had all the trappings of impersonating a law enforcement officer," the government said. *Id.* at 194. In its view, "[t]his is a far [sic] from possessing a firearm for self-protection." *Id.*

8

The district court again refused to dismiss the indictment. In rejecting Mr. Duque-Ramirez's as-applied challenge to § 922(g)(5), the district court incorporated much of the reasoning from its earlier order rejecting the facial challenge. Mr. Duque-Ramirez was then convicted pursuant to his guilty plea and sentenced to 30 months' imprisonment with no term of supervised release.[4]

This timely appeal followed.

## II

Mr. Duque-Ramirez contends § 922(g)(5) is unconstitutional under the Second Amendment as applied to him.[5] "[A]n as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the *particular circumstances* of the case." *United States* v. *Harrison*, 153 F.4th 998, 1007 (10th Cir. 2025) (quoting *United States* v. *Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (alteration in original)). We review as-applied challenges to a statute's

___

[4] The district court held a hearing on Mr. Duque-Ramirez's motion to withdraw his guilty plea, but ultimately denied that motion "as moot." App. I at 237. Mr. Duque-Ramirez has not challenged that ruling on appeal, so we do not consider it. *Brever* v. *Rockwell Int'l Corp.*, 40 F.3d 1119, 1125 n.6 (10th Cir. 1994) (explaining we "do not address" what appellant "does not appeal").

[5] Mr. Duque-Ramirez does not reprise any facial challenge here or otherwise appeal the order denying the first motion to dismiss, where he asserted the facial challenge.

9

constitutionality *de novo*. *See United States* v. *Smith*, 100 F.4th 1244, 1249 (10th Cir. 2024). "Statutes are presumed constitutional." *Harrison*, 153 F.4th at 1009 (quoting *United States* v. *Dorris*, 236 F.3d 582, 584 (10th Cir. 2000)).

The Second Amendment to the United States Constitution reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "When ratified, the Second Amendment did not establish a novel principle but rather affirmed a pre-existing right inherited from our English ancestors." *Rocky Mountain Gun Owners* v. *Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (citing *District of Columbia* v. *Heller*, 554 U.S. 570, 592 (2008)). "The liberty to keep and bear arms, however, 'is not unlimited.'" *Id.* (quoting *Heller*, 554 U.S. at 626). "[T]he government may still lawfully regulate firearms, as it has done for centuries." *Id.* (citing *Rahimi*, 602 U.S. at 690–91).

"To ascertain the constitutionality of a law burdening an individual's exercise of the Second Amendment, we apply a two-part burden-shifting framework first established in *Bruen* and later clarified in *Rahimi*." *Id.* "At step one, the plaintiff has the burden of establishing that 'the Second Amendment's plain text covers' either the conduct they engaged [in] or intended to engage in." *Id.* (quoting *Bruen*, 597 U.S. at 17). "If the plaintiff

meets this burden, 'the Constitution presumptively protects that conduct.'" *Id.* (quoting *Bruen*, 597 U.S. at 17). "[T]he burden then shifts to the government to justify its regulation by demonstrating that it is 'consistent with the *principles* that underpin our' Nation's historical tradition of firearm regulation." *Id.* (quoting *Rahimi*, 602 U.S. at 681).

To carry its burden at *Bruen* step two, the government must identify an analogous historical law "relevantly similar" to the challenged modern law. *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 29). Whether a historical regulation is "relevantly similar" depends on "*how* and *why* the regulations burden" the Second Amendment right. *Bruen*, 597 U.S. at 29 (emphasis added). "We thus ask 'whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified*.'" *Harrison*, 153 F.4th at 1009 (quoting *Bruen*, 597 U.S. at 29). Importantly, the government needs to identify only a "representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30.

When considering historical analogues, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (emphasis added). "Evidence from the founding era—or the years surrounding 1791, when the Second Amendment was first ratified—is most

11

probative." *Harrison*, 153 F.4th at 1010 (citing *Bruen*, 597 U.S. at 34). "The point to remember . . . is '[h]istorical regulations reveal a principle, not a mold.'" *Id.* (quoting *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (alteration in original)). If the government satisfies its burden, then a court may conclude that the regulation at issue "survives [the] challenge" to its constitutionality. *Rahimi*, 602 U.S. at 693. In general, "we base our decision on the historical record as compiled by the parties." *Rocky Mountain Gun Owners*, 121 F.4th at 113.

## III

With the background law in mind, we now describe the district court's reasoning in the order on appeal.

The district court began with the *Bruen* framework. At the outset, it recognized neither this court nor the Supreme Court has answered "whether noncitizens unlawfully present are covered by the plain text of the Second Amendment." App. I at 242. The district court relied heavily on the reasoning in *United States* v. *Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012). There, we considered a constitutional challenge to § 922(g)(5) brought by a Mexican national who argued the Second Amendment's reference to "the people" included aliens unlawfully present. *See id.* at 1165–67. *Huitron-Guizar* assumed "the people" covered by the Second Amendment "could very well include . . . at least some aliens unlawfully

12

here." *Id.* at 1169. But *Huitron-Guizar* then went on to "easily find § 922(g)(5) constitutional" without addressing the "'large and complicated'" question of the meaning of "the people." *Id.* at 1168–69. The district court here, following *Huitron-Guizar*'s example, "assume[d], without deciding, Defendant is included within the Second Amendment's reference to the right of 'the people' to bear arms." App. I at 243.

The district court then turned to *Bruen* step two, which requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The government had presented founding-era laws from several states "disarming those who presumptively have an allegiance to a foreign sovereign and have not taken an oath of allegiance." App. I at 70–71 (citing laws between 1776 and 1779 from Pennsylvania, Virginia, New Jersey, North Carolina, and Massachusetts). The district court concluded these laws satisfied the government's burden to show "§ 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation." App. I at 244.

According to the district court, the "how" and "why" of the historic loyalty laws matched § 922(g)(5). The "how" is the same, the court explained, because § 922(g)(5) contemplates "a total prohibition on firearm access." *Id.* And the "why" is "sufficiently comparable" because "both Congress and historical legislatures believed prohibiting firearms to those

13

who have not demonstrated allegiance to this nation might put weapons in the hands of those who would do the nation harm." *Id.* (quotation omitted).

The district court then turned to the new argument raised by Mr. Duque-Ramirez in his as-applied challenge. Relying on *Rahimi*, 602 U.S. at 692, Mr. Duque-Ramirez argued the government had to conduct an individualized assessment of his dangerousness before it could disarm him under § 922(g)(5). "While the founding generation did disarm British loyalists," Mr. Duque-Ramirez argued, "it only did so after conducting an individualized assessment of the disarmed person." App. I at 120.

Rejecting Mr. Duque-Ramirez's argument, the district court concluded *Rahimi* did not support an individualized assessment of dangerousness in his case. *Rahimi* involved an as-applied challenge to 18 U.S.C. § 922(g)(8)(C)(i)—a statute disarming individuals subject to a domestic violence restraining order. 602 U.S. at 688, 701. The district court observed a "significant difference" between § 922(g)(8)(C)(i) and § 922(g)(5)(A). App. I at 246. In the district court's view, § 922(g)(8)(C)(i) "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* (quoting *Rahimi*, 600 U.S. at 682). But § 922(g)(5)(A) was "a categorical, status-based ban that applies to any noncitizen 'illegally or unlawfully in the United States' without individualized consideration of their dangerousness." *Id.* So even if

14

an individualized determination of a defendant's dangerousness "may be appropriate for a firearm ban [like § 922(g)(8)(C)(i)] that depends on . . . a finding" of dangerousness, the court reasoned, "it is not necessary where the law at issue is a categorical ban like § 922(g)(5)(A)." App. I at 247.

In the district court's view, history also did not support an individualized dangerousness assessment under § 922(g)(5)(A). The "determinative factor for dispossession of a firearm" in the founding-era laws, the district court explained, "was a refusal to swear an oath of allegiance—without specific inquiry regarding individual dangerousness or risk of violence." App. I at 248 (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & HIST. REV. 139, 161 (2007)). And "nothing in the historical record" submitted by the parties "indicates there was a tradition that a loyalist could still be permitted to carry a firearm despite not having sworn an oath." App. I at 248. The district court found it significant that a loyalist who had not sworn the oath could be disarmed "even if they were not particularly dangerous or untrustworthy." App. I at 248. Accordingly, the district court rejected Mr. Duque-Ramirez's as-applied challenge to § 922(g)(5)(A) and refused to dismiss the indictment.

15

## IV

Mr. Duque-Ramirez urges reversal. He argues, at *Bruen* step one, he belongs to "the people" referenced in the Second Amendment's plain text. While the district court assumed as much, he now urges this court to resolve the issue on the merits in his favor. At *Bruen* step two, Mr. Duque-Ramirez insists the government has not carried its burden of showing our Nation's historical tradition of firearm regulation supports disarming individuals with extensive ties to the United States. We are not persuaded, as we will explain.

## A

At *Bruen* step one, the challenger (here Mr. Duque-Ramirez) "is tasked with establishing that the Second Amendment's explicit text, 'as informed by history,' encompasses the conduct they seek to engage in." *Rocky Mountain Gun Owners*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17, 19). To that end, this court "ask[s] whether the challenger is part of 'the people' whom the Second Amendment protects[.]" *Id.* at 114 (quotation omitted).

Mr. Duque-Ramirez insists he belongs to "the people" referenced in the Second Amendment's plain text. An individual is part of "the people" protected by the Second Amendment, Mr. Duque-Ramirez posits, if that individual (like him) has developed a "significant voluntary connection to

this country." Op. Br. at 19–21 (citing *Verdugo-Urquidez*, 494 U.S. at 271). He relies on *Verdugo-Urquidez*, where the Court considered the Fourth Amendment's protection of "the people" against unreasonable searches and seizures. *See* 494 U.S. at 261, 265. Deeming "the people" to be a "term of art employed in select parts of the Constitution," the Court concluded the phrase "refers to a class of persons [1] who are part of a national community or [2] who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 265. The Court suggested its definition of "the people" applies to "the Fourth Amendment, and . . . the First and Second Amendments . . . ." *Id.*

The government argues Mr. Duque-Ramirez is not among "the people" protected by the Second Amendment. The government observes, at "step one," this court considers "the Second Amendment's explicit text, 'as informed by history[.]'" Ans. Br. at 10 (quoting *Rocky Mountain Gun Owners*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17, 19)). And "history suggests that 'the people' with a right to keep and bear arms is limited to citizens." Ans. Br. at 20; *id.* at 21 ("[A]t least for the right to keep and bear arms, the phrase 'the people' was associated far more closely with citizens rather than illegal aliens."). For support, the government marshals its historical research, pointing to English laws, laws from the colonial period and the founding era, legal treatises, and several state constitutions. *See*

Ans. Br. at 17–20. The government observes Mr. Duque-Ramirez has presented no contrary evidence, thus failing to carry his burden "to show that illegal aliens (generally) or he (specifically) are part of 'the people' whom the Second Amendment protects." Ans. Br. at 7.

We will assume without deciding Mr. Duque-Ramirez belongs to the people protected by the Second Amendment. Like the district court, we follow the approach in *Huitron-Guizar*, 678 F.3d at 1165–69, where we "*assum[ed]*, for purposes of this case, that the Second Amendment, as a 'right of the people,' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here." *Id.* at 1169. We also described as "vexing" whether aliens unlawfully present belong to "the people" protected by the Second Amendment right and observed the answer to that question has "far-reaching" consequences. *Id.* at 1167, 1169. Still, even without resolving that challenging threshold question, we "easily" found "§ 922(g)(5) constitutional." *Id.* at 1169.

So too here. The compelling evidence on *Bruen* step two, which we will discuss, allows us to resolve Mr. Duque-Ramirez's as-applied challenge without deciding the "large and complicated" question of what "the people"

18

means for purposes of the Second Amendment. *Id.*[6] We recognize neither

the Supreme Court nor this court has resolved this question.[7] And we need

---

[6] To be sure, *Bruen* abrogated *Huitron-Guizar*'s use of intermediate scrutiny. *See* 678 F.3d at 1169–70; *Bruen*, 597 U.S. at 19 (rejecting "means-end scrutiny in the Second Amendment context"). The Supreme Court in *Bruen* established a new framework for Second Amendment jurisprudence. *See Bruen*, 597 U.S. at 19, 24; *Rahimi*, 602 U.S. at 712 (Gorsuch, J., concurring) (describing *Bruen* as a new "approach"); *id.* at 742 (Jackson, J., concurring) (describing *Bruen* as "a new legal standard"); *id.* at 749 (Thomas, J., dissenting) (stating *Bruen* "rejected the means-end-scrutiny approach and laid out the appropriate framework"). But nothing in *Bruen* disturbed *Huitron-Guizar*'s discussion of what "the people" means under the plain text of the Second Amendment at *Bruen step one*. And we have already explained the Supreme Court's recent Second Amendment cases, which apply the *Bruen* framework, do not automatically abrogate our precedent on the subject. *See Vincent* v. *Bondi*, 127 F.4th 1263, 1265 (10th Cir. 2025) (holding earlier circuit precedent has not been abrogated by *Rahimi*, 602 U.S. 680 (2024)).

[7] The Court has yet to settle whether "the people" refers to members of the "*political* community" (as urged here by the government) and/or the "*national* community" (as urged here by Mr. Duque-Ramirez). Precedent has invoked both meanings. *E.g.*, *Heller*, 554 U.S. at 580 (stating, in the same paragraph, the term "the people" both "refers to all members of the political community" and also "refers to a class of persons who are part of a national community" (quotation omitted)). According to the government, the political-community definition restricts "the people" to those individuals who possess certain "fundamental" civil rights, such as the right to vote, the right to seek and hold public office, and the right to serve on a jury. Op. Br. at 26–27 (citing *United States* v. *Maines*, 20 F.3d 1102, 1104 (10th Cir. 1994)). The national-community definition comes from *Verdugo-Urquidez*, 494 U.S. at 260, which defined "the people" as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." In *Heller*, the Court recited *Verdugo-Urquidez*'s national-community definition. *See* 554 U.S. at 580. We also have relied on the national-community definition. *See Rocky Mountain Gun Owners*, 121 F.4th at 114;

not do so today. *Harrison*, 153 F.4th at 1010 n.5 ("If it is not necessary to decide more, it is necessary not to decide more." (quoting *PDK Labs. Inc.* v. *DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring))).

**B**

We now turn to *Bruen* step two. Here, the burden swings to the government to show "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at

---

*Harrison*, 153 F.4th at 1015 (explaining "[i]t would be implausible under ordinary principles of construction to conclude the word 'people' has different meanings" in the Constitution (quotation omitted)).

Yet we hesitate to deem the issue settled. *First*, in the very next sentence following the national-community definition in *Verdugo-Urquidez*, the Court quoted *United States ex rel. Turner* v. *Williams*, 194 U.S. 279 (1904) and, in a parenthetical, said: An "[e]xcludable alien is not entitled to First Amendment rights, because '[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law.'" *Verdugo-Urquidez*, 494 U.S. at 265 (quoting *Williams*, 194 U.S. at 292). *Second*, *Heller*'s own gloss on "the people" omitted the "significant connection" language from *Verdugo-Urquidez* and substituted "national community" for "political community." *Heller*, 554 U.S. at 580. *Third*, *Heller* five times cited *United States* v. *Cruikshank*, 92 U.S. 542 (1875), which stated, "*Citizens* are the members of the political community to which they belong." *Id.* at 549 (emphasis added). *Finally*, "it is not exactly reading between the lines to note how frequently the [Supreme Court] connected arms-bearing and citizenship." *Huitron-Guizar*, 678 F.3d at 1168. The word "citizen" was used some three dozen times in *Heller*, nearly two dozen times in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), nearly two dozen times in *Bruen*, and a half-dozen times in *Rahimi*. In light of all this, we decline to decide the meaning of "the people" when this appeal does not require us to do so.

692 (citing *Bruen*, 597 U.S. at 26–31).[8] In determining if the challenged law—the modern statute—is "relevantly similar" to old regulations, the court must consider "why and how the regulation burdens the right." *Id.* "Here, we engage in what the Supreme Court calls 'analogical reasoning.'" *Harrison*, 153 F.4th at 1016 (quoting *Bruen*, 597 U.S. at 28–30). The government must marshal historical analogues to demonstrate § 922(g)(5), as applied to Mr. Duque-Ramirez, is consistent with this Nation's historical tradition of firearm regulation. The dispositive question before us is whether the government has shown § 922(g)(5), as applied to Mr. Duque-Ramirez, "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. The district court answered yes, and so do we.

**1**

We begin with the "heart of *Bruen* step two": whether historical analogues marshaled by the government reveal "'principles' in 'our regulatory tradition' [that] are 'consistent with'" Congress's decision to disarm" aliens unlawfully present under § 922(g)(5). *Harrison*, 153 F.4th at 1019 (quoting *Rahimi*, 602 U.S. at 692). Recall, the district court concluded

---

[8] The parties do not dispute the "threshold" issue of whether § 922(g)(5)(A) "addresses a general societal problem that has persisted since the 18th century." *Harrison*, 153 F.4th at 1016 (quoting *Bruen*, 597 U.S. at 26). For purposes of this appeal, we assume it does.

21

founding-era laws from several states "disarming those who presumptively have an allegiance to a foreign sovereign and have not taken an oath of allegiance" satisfied the government's burden to show "§ 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation." App. I at 70–71, 244.

On appeal, Mr. Duque-Ramirez argues these laws are not "relevantly similar" to § 922(g)(5) and thus cannot suffice to meet the government's step-two burden. For its part, the government argues our Nation has a broad and deep tradition of "disarming those who had not sworn an oath of allegiance." Ans. Br. at 29 (quoting App. I at 92).

The government begins with the English tradition. The English Bill of Rights—which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—limited the right to possess firearms to "Subjects," who unlike "aliens" owed their allegiance to the monarchy.[9] 1 W. & M., sess. 2, ch. 2 (1688), 6 Statutes of the Realm 143 ("That the subjects which are protestants, may have arms for their defence suitable to their conditions, and as allowed by law."); *see also* 1 WILLIAM BLACKSTONE, COMMENTARIES *139 (stating "having arms" was "[t]he fifth

_____

[9] The government states "our English ancestors used 'subject' rather than 'citizen' prior to independence," but the historical concept of "subject" is "analogous" to the modern concept of "citizen." Ans. Br. at 22.

and last auxiliary right of the subject"); An Acte Concerninge Crosbowes and Handguns, 33 Hen. VIII ch. 6, § 1 (1541), 3 Statutes of the Realm 832 (restricting the possession of firearms to landowners); *Bayard* v. *Singleton*, 1 N.C. 5, 9 (1787) ("[B]y the civil, as well as by the common law of England, *aliens* are incapacitated to hold lands."); *cf.* 3 Hen. VIII, ch. 3 (1511–12), 3 Statutes of the Realm 26 (prohibiting foreigners from using long-bows). The government reads these sources to mean English law permitted disarming aliens who did not swear allegiance.

According to the government, this historical tradition "spread to this nation." Ans. Br. at 30. Founding-era laws in at least six states disarmed "those who were presumed loyal to England unless they swore an oath of allegiance to one of the new states." *Id.* (citing 9 Pa. Stat. at Large 348 (1779); 9 Va. Stat. at Large 282 (1821) (1777 Act); 24 The State Records of N.C. 89 (Walter Clark, ed. 1905) (1777 Act); 1777 N.J. Laws 90, ch. 40, § 20; 7 Records of the Colony of Rhode Island and Providence Plantations in New England 566–68 (1862) (1776 Act); 5 The Acts and Resolves, Public and Private, of the Massachusetts Bay 479–84 (May 1, 1776)). The government derives from these sources a principle: Aliens "could be prevented from keeping and bearing arms" based on "lack of allegiance to the sovereign." Ans. Br. at 31 (quoting *United States* v. *Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quoting Don B. Kates, Jr., *Handgun Prohibition and the*

23

*Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 217 n.54 (1983))).

We agree with the government. There is a tradition, beginning in England and enduring into the founding era, of disarming individuals presumed to be loyal to a foreign sovereign who had not sworn their allegiance via a method prescribed by the legislature. English law prohibited those who had not legally demonstrated their allegiance from bearing arms. *See* 1 W. & M., sess. 2, ch. 2 (1688), 6 Statutes of the Realm 143; 3 Hen. VIII ch. 3 (1511–12), 3 Statutes of the Realm 26. Parliament also required some to swear an oath of allegiance prescribed by law before possessing arms. *E.g.*, 7 William III ch. 5 (1695).

Early Americans did the same. At the founding, Americans treated the right to bear arms as a "civic right" limited to "those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship,* 29 N. KY. L. REV. 657, 671 (2002). As the government correctly points out, North Carolina and Pennsylvania enacted allegiance laws a year after the adoption of state constitutional provisions protecting the right to bear arms, suggesting early Americans saw no conflict between the right to bear arms and disarming the disloyal. *See Heller*, 554 U.S. at 585–86, 601–03 (analyzing state constitutions to discern

24

the meaning and scope of the Second Amendment). And seven state constitutions between 1776 and 1820 stated the right to bear arms belongs to "citizens." Ans. Br. at 19–20 (collecting provisions); *see Heller*, 554 U.S. at 603 ("That of the nine state constitutional protections for the right to bear arms enacted immediately after 1789 at least seven unequivocally protected an individual *citizen's* right to self-defense is strong evidence that that is how the founding generation conceived of the right." (emphasis added)).

The "how and why" of the historical tradition match those of the modern law. *See Bruen*, 597 U.S. at 29. Recall, comparable burdens (the how) and comparable justifications (the why) supply "central considerations" in our step-two inquiry into the constitutionality of § 922(g)(5). *Id.* First, the *how*. The founding-era laws banned arms-bearing by individuals presumed to be loyal to a foreign sovereign who failed to follow the procedure laid out by the legislature to demonstrate allegiance (then, the loyalty laws). This matches the *how* of § 922(g)(5): banning arms-bearing by individuals presumed to be loyal to a foreign sovereign who fail to follow the procedure laid out by the legislature to demonstrate allegiance (today, the naturalization laws).

The *why* also matches. The founding-era laws required an individual to demonstrate allegiance before bearing arms by following the path

prescribed by the legislature—namely, taking an oath—because allegiance demonstrates trustworthiness. *See United States* v. *Carbajal-Flores*, 143 F.4th 877, 887–88 (7th Cir. 2025) ("Allegiance serves as a mark of trustworthiness."). Likewise, federal law today requires an alien to demonstrate allegiance before bearing arms by following the path prescribed by Congress—the naturalization laws, which require an oath, *see* 8 U.S.C. § 1448—as a demonstration of trustworthiness.

The historical evidence submitted by the government, and relied on by the district court, confirms an "alien" presumed to retain loyalties to a foreign sovereign may be prohibited from bearing arms if he fails to swear allegiance in a process prescribed by law.[10] *See Carbajal-Flores*, 143 F.4th

---

[10] Mr. Duque-Ramirez does not cite any laws, regulations, practices, or other evidence to support his claims about the founding-era allegiance laws. To be sure, he does not have the burden at *Bruen* step two; the government "bears the burden to 'justify its regulation.'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24). Importantly, the Supreme Court teaches that a court's historical inquiry depends on party presentation. *Bruen*, 597 U.S. at 25 n.6 (explaining the "legal inquiry" under *Bruen* "is a refined subset of a broader historical inquiry, and it relies on . . . the principle of party presentation," among other doctrines (quotation and citations omitted)); *see id.* ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."); *e.g.*, *Rocky Mountain Gun Owners* v. *Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (following "the principle of party presentation" and explaining "we base our decision on the historical record as compiled by the parties"). "Historical analysis can be difficult." *Bruen*, 597 U.S. at 25 (quoting *McDonald* v. *City of Chicago*, 561 U.S. 742, 803 (2010) (Scalia, J., concurring)). Increasingly, historical statements by courts in the Second Amendment context are viewed as precedential,

at 888–89 (similarly identifying the principle of "allegiance to the sovereign" as a valid "why" behind historical restrictions on arms-possession by aliens and § 922(g)(5)(A)). This principle readily resolves the constitutional question in this appeal. We therefore conclude the government has carried its burden of showing § 922(g)(5)(A), as applied to Mr. Duque-Ramirez, "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

### 2

Mr. Duque-Ramirez offers two counterarguments, but neither disturbs our conclusion.

### a

Mr. Duque-Ramirez first insists the allegiance laws are not "relevantly similar" to § 922(g)(5). In his telling, the historical disarmament of loyalists "was conditioned on choice—a demonstrated refusal to accept this country as one's own." Op. Br. at 24. Mr. Duque-Ramirez says he "is not like a loyalist *refusing* to swear an oath when provided the opportunity."

---

"subject to some sort of stare decisis treatment." Allison Orr Larsen, *Is History Precedent?*, 78 STAN. L. REV. (forthcoming 2026) (manuscript at 12), https://ssrn.com/abstract=5160377 [https://perma.cc/8SUW-LMEM]. Given these conditions, while a defendant does not carry the ultimate burden in Second Amendment cases, we note a robust historical record can be developed by both parties.

Reply Br. at 6. Rather, "like most unlawful noncitizens choosing to reside in this country," Mr. Duque-Ramirez contends he "would demonstrate allegiance to this nation if he could." Op. Br. at 24. After all, he points out, he "was brought here unlawfully as a young child," "created a life here, attended public schools, married a U.S. citizen, has U.S. citizen children, and was by all accounts deeply tied to this country and rooted to Oklahoma City in particular." Reply Br. at 5. He cannot be faulted, he claims, for failing to follow the "labyrinthian immigration laws," which would require him to leave the country for at least ten years to apply for and receive an immigrant visa. *See* Reply Br. at 5–6 (citing 8 U.S.C. § 1182(a)(9)(B)(i)(II)). Choosing to swear an oath, as the historical allegiance laws required, is far less burdensome than "leav[ing] the only country he truly knows for at least a decade, perhaps more, before being eligible for admission, without any guarantee of ever being admitted." Reply Br. at 6.[11] In response, the

---

[11] The government argues Mr. Duque-Ramirez has not attempted to use an available alternative legal pathway to obtain relief from federal firearm disabilities: an application to the United States Attorney General. *See* Ans. Br. at 33 n.7 (citing 18 U.S.C. § 925(c)). Although this alternative pathway was effectively closed for decades, the Attorney General recently started granting § 925(c) relief. *Id.* (citing 90 Fed. Reg. 13080, 17835 (Mar. 20, 2025)). But we do not need to resolve the competing claims about the difficulty of obtaining relief from federal firearm disabilities. Even if the federal law poses a burden as onerous as Mr. Duque-Ramirez describes, we have no basis in this case for concluding the modern burden is anything other than "comparable" to the historical burden posed by oaths. *Bruen*, 597 U.S. at 29; *see infra* at 33–34.

government insists "Mr. Duque-Ramirez made the choice not to follow the path towards legal status laid out by Congress." Ans. Br. at 33.

We are sympathetic to Mr. Duque-Ramirez's position. "Federal governance of immigration and alien status is extensive and complex." *Arizona* v. *United States*, 567 U.S. 387, 395 (2012); *cf. Padilla* v. *Kentucky*, 559 U.S. 356, 369 (2010) ("Immigration law can be complex[.]"); *Santos-Zacaria* v. *Garland*, 598 U.S. 411, 430 (2023) (observing that aliens must "navigat[e] a complex bureaucracy"). But we cannot endorse his appellate argument for at least two reasons.

*First*, Mr. Duque-Ramirez does not precisely describe the historical record. It is true some founding-era laws cited by the government disarmed only after an individual had actively refused to swear an allegiance oath. For example, Virginia's 1777 law "disarmed" only "free born male person[s] above the age of sixteen" who "*refuse*" to take the oath. 9 Va. Stat. at Large 282 (1821) (1777 Act) (emphasis added). But that requirement for active refusal contrasts with a later provision in the very same law, stating those "refusing *or neglecting* to take and subscribe the oath" faced different penalties—namely, being "incapable of holding any office in this state, serving on juries, suing for any debts, electing or being elected, or buying lands, tenements, or hereditaments." *Id.* (emphasis added). Merely "neglecting" to take the oath did not suffice for disarmament; under the

Virginia law, disarmament required active refusal, not passive neglect. *Id.* Similarly, the Continental Congress passed a resolution in March 1776 recommending the colonial governments "cause all persons to be disarmed" who are "notoriously disaffected to the cause of America, or who have not associated, *and shall refuse* to associate, to defend, by arms, these United Colonies. . . ." 4 Journals of the Continental Congress: 1774–1789, at 205 (1906) (1776 resolution) (emphasis added).

It is most precise to say that only some founding-era laws required active refusal. Many permitted disarmament for active refusal *or* passive neglect. For example, Massachusetts disarmed "every male person above sixteen years of age . . . who shall *neglect* or refuse" to swear an oath. 5 The Acts and Resolves, Public and Private, of the Massachusetts Bay 479 (1776) (emphasis added). Likewise, North Carolina disarmed "all persons *failing* or refusing to take the Oath of Allegiance" from keeping arms within their homes. 24 The State Records of N.C. 89 (1777 Act) (emphasis added). In Maryland, a 1778 law prohibited anyone "who *hath not taken* the oath of fidelity to this state, directed by the act" from serving on a jury and further permitted law enforcement, "at their discretion, to disarm any nonjuror." 203 Laws of Maryland (Hanson's Laws of Maryland 1763–1784), at 193 (1787) (emphasis added). The following year Pennsylvania enacted a law empowering officers "to disarm any person or persons who shall *not have*

*taken* any oath or affirmation of allegiance to this or any other state[.]" 9 Pa. Stat. at Large 348 (1779) (emphasis added).

These laws demonstrate that, at the founding, disarmament did not require an active choice to refuse swearing allegiance. An individual could be disarmed for simple "neglect" or passive "failure" to avow their allegiance to the sovereign in the way prescribed by the legislature.

*Second*, Mr. Duque-Ramirez seems to assume § 922(g)(5)(A) imposes a burden incomparably higher than that imposed by the historical allegiance laws. Recall, under *Bruen*, we must ask whether the modern burden Mr. Duque-Ramirez faces "is consistent with the Nation's historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 681 (quoting *Bruen*, 597 U.S. at 24). According to Mr. Duque-Ramirez, individuals at the founding were free to decide whether to comply with the allegiance laws. *See* Op. Br. at 24 (arguing loyalist disarmament "was conditioned on choice"); Oral Argument at 10:10–15 ("The loyalty laws each permitted a chance to swear the oath."). By contrast, he was brought to this country as a child and is now pressed to exit the country to exercise his Second Amendment right, so he has no comparable free choice.

There is significant reason to doubt the historical allegiance laws operated as Mr. Duque-Ramirez describes. Allegiance laws often imposed comparable burdens. An oath could require an individual to renounce their

political, religious, or ethnic heritage. *See Range* v. *Att'y Gen. U.S. of Am.*, 69 F.4th 96, 121–24 (3d Cir. 2023) (en banc) (Krause, J., dissenting) (collecting evidence of odious loyalty oaths in England and early America), *cert. granted, judgment vacated sub nom. Garland* v. *Range*, 144 S. Ct. 2706 (2024); ALEXANDER CLARENCE FLICK, LOYALISM IN NEW YORK DURING THE AMERICAN REVOLUTION 84–85, 122 (1901) (describing the loyalist oath as "harsh" and stating some loyalists "were forced to take the oath of allegiance"). And, even if nominally a free "choice," oaths in our Nation's history carried serious risks and penalties. Failure to agree to the oath could lead to arrest, imprisonment, property confiscation, ostracism, banishment, violence, and loss of the ability to vote, hold office, trade, serve on juries, practice a profession, acquire property, inherit land, or travel at will.[12] *See* HOLGER HOOCK, SCARS OF INDEPENDENCE: AMERICA'S VIOLENT BIRTH 40, 119 (2017); *see also* FLICK, *supra* at 84–85, 122, 170.

---

[12] Of course, such ugly practices "would be unconstitutional today." *Kanter* v. *Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting). But for purposes of our Second Amendment inquiry, these odious laws remain "reflective of American history and tradition." *United States* v. *Duarte*, 137 F.4th 743, 760 (9th Cir. 2025) (en banc). And they inform "our Founders' law." *Bruen*, 597 U.S. at 35. We would therefore be "remiss to ignore them in our attempt to decipher 'the principles that underpin our regulatory tradition.'" *United States* v. *Dubois*, 139 F.4th 887, 897 (11th Cir. 2025) (Pryor, C.J., concurring) (quoting *Rahimi*, 602 U.S. at 692).

On the record before us, therefore, we must reject Mr. Duque-Ramirez's argument that the allegiance laws marshaled by the government are not "relevantly similar" to § 922(g)(5)(A).

**b**

At oral argument, Mr. Duque-Ramirez argued that an individualized assessment of dangerousness is a prerequisite to disarmament under § 922(g)(5). Mr. Duque-Ramirez advanced this argument in the district court, but he did not reprise it in his appellate briefing, as we will explain.

Recall, in his second motion to dismiss the indictment, Mr. Duque-Ramirez, relying on *Rahimi*, argued, "[w]hile the founding generation did disarm British loyalists, it only did so after conducting an individualized assessment of the disarmed person." App. I at 120. The historical analogues "requir[ed] individualization," Mr. Duque-Ramirez told the district court, so § 922(g)(5) must also "require[] an individualized assessment" before he may be lawfully disarmed. App. I at 119–20. The district court rejected this logic. "Based on the historical record" presented by the parties, the district court concluded "it is clear an individual would have been disarmed for having not sworn an oath of allegiance even if they were not particularly dangerous or untrustworthy." App. I at 248. The district court thus concluded § 922(g)(5) could be constitutionally applied to disarm Mr.

33

Duque-Ramirez, even without an individualized assessment of his dangerousness. App. I at 249–50.

On appeal, Mr. Duque-Ramirez does not challenge this ruling or otherwise pursue the argument he made in the district court. In his opening brief, he mentions an individualized assessment only when describing the pretrial proceedings at the district court. Unsurprisingly, the government does not address the individualized-assessment argument in its answer brief. Mr. Duque-Ramirez's reply brief is likewise silent on the issue.

Only at oral argument did Mr. Duque-Ramirez urge reversal for lack of an individualized assessment of his dangerousness. When asked at oral argument about the absence of any such argument in his opening brief, Mr. Duque-Ramirez acknowledged the omission. *See* Oral Argument at 4:35–7:05 (admitting the failure was "not purposeful" and he "certainly meant" to press the argument).

"It is well-settled that arguments inadequately briefed in the opening brief are waived." *United States* v. *Clay*, 148 F.4th 1181, 1201 (10th Cir. 2025). Similarly, "issues raised for the first time at oral argument are waived." *United States* v. *Rivera-Nevarez*, 418 F.3d 1104, 1112 n.12 (10th Cir. 2005). Because Mr. Duque-Ramirez failed to properly raise on appeal whether he may be disarmed under § 922(g)(5) without an individualized

34

assessment as to his dangerousness, we must conclude he has waived the argument.[13] We thus do not reach the issue in this case.

\* \* \*

In sum, even assuming Mr. Duque-Ramirez belongs to "the people" protected by the Second Amendment, the government has carried its burden of showing § 922(g)(5) fits within our tradition of firearm regulation. A principle emerges from the allegiance laws identified by the government: Individuals presumed to be loyal to a foreign sovereign who fail to follow the process prescribed by law for avowing their allegiance may be disarmed.

---

[13] As a general matter, we acknowledge that whether § 922(g) requires an individualized assessment of a defendant's dangerousness is an important open question the Supreme Court has yet to address. *See, e.g.*, *Zherka* v. *Bondi*, 140 F.4th 68, 70 (2d Cir. 2025) (holding § 922(g)(1) may be applied to disarm an individual without a hearing); *United States* v. *Kimble*, 142 F.4th 308, 318 (5th Cir. 2025) (same). *But see, e.g.*, *Pitsilides* v. *Barr*, 128 F.4th 203, 210 (3d Cir. 2025) (holding § 922(g)(1) requires an "individualized determination that the [defendant] does not presently pose" danger). Because we do not address the merits of Mr. Duque-Ramirez's waived argument, we state no opinion on whether, or when, the government may apply § 922(g)(5) against other individuals without first conducting an individualized dangerousness assessment. We also state no opinion on whether, as the government contended at oral argument, a law justified by a principle of allegiance never requires an individualized assessment before disarmament. *See* Oral Argument at 26:53–27:25. In the Second Amendment context, the "scope of the right beg[ins] with 'constitutional text and history.'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 22). Thus, answers to questions about individualized dangerousness assessments under § 922(g) require careful study of this "Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This case does not present such an opportunity.

Mr. Duque-Ramirez admits he has failed to follow the naturalization laws. And so, applying the principle identified here, we reject Mr. Duque-Ramirez's as-applied challenge to § 922(g)(5)(A).

**V**

We **AFFIRM** Mr. Duque-Ramirez's conviction.